Good morning ladies and gentlemen. All your makeup and devices must be turned off. Please take your cell phone, make sure your cell phone is turned off. Please remember this is not allowed in the courtroom. You are taking three hours and must be put away. Please take your cell phone. Counselor, you do not suffer from constipation. I'll be starting in three minutes. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you.  Yes.  Thank you. Yes. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. All rise. Thank you. Thank you. Be seated. And good morning, everyone. The first argued case this morning is number 14-17-44, Morosan Manusman, Morosanoe, against the United States, Ms. Mendoza. Good morning. May it please the Court, my name is Julie Mendoza, and I'm appearing on behalf of Plaintiff Appellant Morosan Manusman. I plan to use 12 minutes of my time for my affirmative presentation and reserve three minutes for rebuttal by my partner, Don Cameron. In this case, the Commerce Department unlawfully applied targeted dumping methodology to Morosan in the 2010-2011 review. Despite uncontested record evidence that Morosan increased its U.S. prices after February to account for the increasing cost of raw materials. As record evidence confirmed, raw materials constituted a very high percentage of the total cost of the product under consideration, and therefore it was economically sensible for Morosan to increase its prices. Do you think they should have done it shipment by shipment? No, I believe, Your Honor, that the Commerce Department should have used the average-to-average methodology in comparing their prices and not resorted to the targeted dumping provision as an error, and I believe that they could not meet the requirements of the targeted dumping provision. Well, is that really what you argued? Is it that they should use average-to-average, or are you saying that in using the methodology they used, they still have an additional step that they have to undergo? No, Your Honor. Actually, our argument is that Commerce proceeded under 19 CFR 351.414C1, which provides that in both investigations and reviews, the Commerce Department will use average-to-average methodology. In our case, they also said that in the event that they find that there is targeted dumping, they would resort to the A-to-T methodology, and therefore Commerce's decision to resort to the A-to-T methodology depends on whether or not they were lawfully applied their targeted dumping provision. Otherwise, they had to use the A-to-A methodology, which we believe is accurate. Our margin was zero with A-to-A. So you're saying they can't get to a targeted dumping determination, though, until they consider the raw material price increases?  I think what I'm trying to say, Your Honor, is that once they start with the premise that they should use the average-to-average methodology, Commerce then said, only in the event that we find that the requirements of 1677F1D1B, i.e., the targeted dumping provision, only if those requirements are met will we then use the A-to-T methodology. And your view is that 1677F1D requires reasons? No, Your Honor, not actually reasons. I believe what our position is is that in this case, because we did not dispute that, in fact, the price increase was fully explained by the changes in the cost, as a consequence, that evidence went directly to the question of whether there was targeted dumping. Well, the statute speaks in terms of reasons why one and two may not explain the price difference. Aren't you saying that given the cost of the product, that's why one and two can't explain it? Well, yes, in part. I mean, what we're saying is that with respect to the requirement that Commerce find a pattern of price differences, the first test, we believe, and it goes on to say in the FAA, i.e., targeted dumping may be occurring. We believe that because we presented evidence that, in fact, targeted dumping was not occurring, in fact, this was simply a matter of pricing in order to take into account increasing raw material prices and to avoid dumping, that that requirement was not met. Moreover, Commerce's test, that is, can the normal methodology, i.e., average to average, take into account this pattern, we believe, because it did not constitute targeted dumping and therefore Commerce had no basis for resorting to an exceptional methodology. So you want to insert essentially a requirement that the pattern of price differentials be unexplained by other variables? No, Your Honor. I think what we're saying is that Congress didn't just say that there had to be significant price differences in the FAA. They said, i.e., targeted dumping may be occurring. And therefore, we believe that Commerce must look at the occurring. The problem is that if they move, when they move to Step 2 and they say, can the normal methodology take into account the targeted dumping or take into account this pattern of prices that we see, Commerce simply doesn't even look at whether there's targeted dumping. In fact, they say, oh, this provision has nothing to do with targeted dumping. And they say, we're just going to look and see what the result is. Right. So I think your answer to my question actually was yes, that the price differentials have to be unexplained by something other than targeted dumping. Yes, correct, Your Honor. I'm sorry. So then if that's the case, you present one potential variable. Do you believe that it's Congress's obligation to consider all variables or is there kind of a burden shifting going on here that only if something's presented to Commerce? In the latter, Your Honor. I mean, in other words, we don't believe that Commerce has to go out and look for the reasons or has an affirmative duty to do that. However, Commerce does have an obligation to look at reasons that are documented in the record that would explain the variation in prices and therefore would confirm that there's no targeted dumping. So in most cases, if there's no positive evidence presented by a party with respect to why the pattern exists as it does, then Commerce would have the right, we concede, to proceed to find that there is targeted dumping. But when a party has presented affirmative evidence based on objective criteria, then Commerce does have an obligation to examine whether that could still be considered targeted dumping. But the statute itself simply speaks in terms of a price differential, correct? Yes, it does, Your Honor. So do we have an ambiguity that kicks us back to Chevron? Well, Your Honor, I believe that under Timex, your Timex decision, that in essence what you said was that not only do we look at the language of the statute, and this is particularly true with the FAA because Congress voted on it and adopted it as a, you know, accepted the definitions therein as a definitive interpretation of what it meant by the law. So I think you have to read those together under any standard, Chevron 1 or Chevron 2. Okay. I think that part of the issue here really goes down to the point that Commerce's position is basically that targeted dumping and targeting has nothing to do with this provision. In fact, before the lower court, Commerce, I mean the government, was specifically asked whether they believe that significant price differences equal targeted dumping. And they specifically said no. They said that targeted dumping has nothing to do with this exceptional provision, and we find that to be a rather remarkable statement given the fact that the FAA itself says that targeted dumping, that this is an exception for targeted dumping. And I can give you that site, but it's specifically... Can you read? Yes. So we believe that the fundamental problem here, in addition to the problem we've discussed, is that when Commerce gets to step two, their rationale for why they find that the differences are significant is simply that it results in a different result. I mean, in other words, the dumping margin is different under a methodology that compares average to average versus average to transaction. What I submit is that that difference has nothing to do with price changes. In other words, when you do the dumping calculation on any dumping database and you use those two methodologies, they're going to yield different results. One, because of what the court said and observed in the Beijing Taizan case, which is that averaging versus transaction to transaction mathematically leads to a different result. But there's an additional reason, which is that Commerce, when they use average to average, they don't zero. They don't take into account negative... They take into account negative margins. When they use the average to transaction methodology, they do not. They do not consider negative margins. As a consequence, you almost always get a difference in result. So we don't understand why that test can satisfy Congress's specific requirement that the Commerce Department establishes and explains why the normal methodology cannot take into account this pattern of price differences that they're observing. We believe that under Commerce's methodology of using A to T, what they have done is to improperly inflate the margin. They've amplified the margin. In other words, it's a truism that if you do it under one methodology, you get one result. Another methodology, you get another result. But the question is, which one is accurate? And I'd refer the Court to Judge Rastani's decision in Borden where she refers to the several reports, one by the Congressional Budget Office, which concluded that transaction-specific price comparisons are statistically biased toward finding a dumping margin. And that when, in fact, the actual margin is small and you apply the average transaction methodology, what you're doing is creating a bias in favor of margins and you're amplifying the margins themselves. But where are you getting this in the statute itself, the requirement that Congress has an obligation to discern the reasons for the price differential? In the SAA, Your Honor. Okay. So you're saying that the SAA actually requires this? Yes, Your Honor. In fact, there's a two-part test in the SAA. And Congress, in fact, admits as much. Congress does not dispute this point. It says on page, I think it's 833, Your Honor. It says, New Section 77A.D.1B provides for a comparison of average normal values to situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly, i.e., where targeted dumping may be occurring. Before relying on this methodology, however, commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average methodology. All right. But it doesn't say that, well, first of all, it talks about, it does refer to the fact that targeted dumping may be occurring. So they don't have to make a formal determination that it is occurring. And when you say that Congress has an obligation to provide an explanation, their explanation is simply to say why the use of an average-to-average or transaction-to-transaction comparison doesn't account for it. I don't see that saying that they have to consider all possible variables that would account for the price differential. Well, I think if you read it in context, Your Honor, I'd suggest that the I.E., where targeted dumping may be occurring, is saying, it's suggesting that if you observe this pattern, right, of significant price differences, it may be the situation that targeted dumping is occurring. So what we're saying is that finding this pattern is simply a precondition to then look at whether targeted dumping may be occurring. And that this subsequent test, this sort of additional requirement Congress has imposed due to the exceptional methodology restrictions, basically is saying that, yes, you have to determine whether it's necessary. Because if you don't determine whether it's necessary, the question could be that you're simply amplifying the margin. I mean, if they're not engaging in targeted dumping, there's nothing to unmask. There's nothing to determine there. Your argument's a little bit circular, though, because in order to get to this, the legislative history that Congress was supposedly implementing, or the discussion of what they were supposedly implementing, we have to find that the statute's ambiguous. If we find that the statute's ambiguous, then we're kicked right back to Chevron. Are we not? No, Your Honor. I believe that the SAA is part, in Timex, the court said that even under Chevron 1, you do not look solely to the words of the statute, but you also consider the legislative history. And what we're suggesting is that, and under the presence of this court, that it has always read the SAA in conjunction with the law in determining whether or not something is plain from the words of the statute, that the court doesn't just say, oh, it's nothing in the statute. We throw up our hands. We don't look at any legislative history, even under Chevron 1. We also look at the legislative history. And the SAA is a very special kind of legislative history because of Congress's statement in the context of approving it, that it's to be the definitive statement of their interpretation of the law. You were saving some time for Mr. Cameron. Is that part of your argument in truth or the rebuttal? Rebuttal, Your Honor. Oh, okay. Then we'll hear from the government. Mr. Kerland. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. The concept of dumping connotes a practice whereby a company sells goods in the U.S. at a lower price than fair value in its home market. Now, we understand the concept, but how about this particular case? Well, the concept of dumping, the crux of this case is that the concept of targeted dumping is just doing the same thing to a particular purchaser, region, or time period. And the issue here is that Orison's case is built on an incorrect presumption that that concept of targeted dumping also entails an intentionality component, that it has to be purposeful behavior to a customer, region, or time period, despite their protest to the contrary. And I have a couple of record citations that demonstrate this from the very beginning of this proceeding, and I'm particularly looking at page JA2856 of the record and 3148 of the record, which are Orison's initial responses to the allegations of targeted dumping, where Orison said, by definition, the concept of targeting indicates an affirmative or conscious effort. I mean, at least in their briefs, they sort of backed off of this intentionality concept, and their argument is that if there's a rational business purpose behind the price differential, then it's not dumping. I understand that, Your Honor, although I would disagree slightly. I think what Orison has done is effectively used the word targeting synonymously for the idea of purpose or intentionality. So they say, as long as you define targeting as purposeful behavior, and remember, it's not just called targeted dumping. I mean, this court in Union Steel at Note 3 referred to the concept of targeted or masked dumping, and I don't want to belabor the quote. But what's your response to the notion that all they're doing is saying that targeted dumping really means an unexplained price differential, and in this case, it's explained by business purposes? Right. Well, I think I have a legal response and a factual response. The legal response is, when you look right at the FAA, I mean, the first paragraph, and I'm looking at the copy of the Helen's reply brief, you know, the FAA speaks to targeted dumping. This is page 842, and the paragraph has targeted dumping in quotes, and it says, in such situations, the exporter may sell at a dump price to particular customers or regions while selling at a higher price to other customers and regions. So, again, the whole concept is merely defined by a pattern of price differences where there's a significant difference to particular customer regions or time periods, and that's plainly what's in the statute. So this notion that there may be legitimate commercial reasons or other reasons why there was a pattern of price differences to a particular customer region time period that also results in a meaningful difference between the A to A and the A to T methodology isn't part of the statute, and it isn't part of the FAA either. To maybe clarify one point that's been slightly confusing, when the statute refers to the fact that targeted dumping may be occurring, what it's referring to is the fact that the test that is laid out in the statute are simply the prerequisites for commerce applying the A to T methodology, and it's the A to T methodology that then allows one to determine whether there is targeting or masked dumping occurring. All right. Well, several paragraphs down in the FAA where the section is that your friend on the other side cited, there's a reference to commerce having to explain why the average to average or transaction to transaction comparison can't account for the difference. I mean, what are they explaining? I mean, you're just saying it doesn't show it. It doesn't, as a matter of math, show it. But that doesn't mean – what does account mean? Right. Well, there are, I think, a couple different ways. First of all, when it says commerce will look at this on a case-by-case basis, what it's talking about is the fact that, like here, one had a 3% difference between A to A and A to T methodology, and it crossed what the courts have called the de minimis threshold, where on the one hand, with the A to A methodology, you're not identifying dumping, and with the A to T, because – and this is the factual component of my point earlier – because it turns out, at the end of the day, the vast majority of these sales in February 2010 that were identified by commerce's targeted dumping analysis or masked dumping analysis turned out to be sales that were dumped. That is, the vast majority of the sales that were caught by commerce's statistical methodology were also sales that were sold in the U.S. at less than their price in the home market. When you apply that A to T methodology, that masking by the non-dump sales is pulled back, and you get a dumping rate. So commerce, in its general practice, has said, if it crosses the de minimis threshold, that is a meaningful difference. But it's on a case-by-case basis, because as the SAA says, there's a difference between going from 0% to 3% and going from, for example, 150% to 153%. That wouldn't be a meaningful difference. I mean, all of this – there's a lot of math in all of this. Sure. So what is a meaningful difference? What is the threshold? Well, in this case, it's the fact that it crossed the de minimis threshold. But you never define what that de minimis threshold is. That's what I'm trying to figure out. Is it 0.4% versus 0.6%? No, Your Honor. It's statutorily defined as 0.5%. And there's been quite a bit of litigation at the CIT on this issue. Commerce, I think, initially was a little – commerce is always leery about using numbers in its issues and decision memorandum, because you have BPI issues and things of that nature. But on page 3736 of the record, you have the final results of commerce's analysis, and it's saying, look, here's 0, and here's 3.55%. And we've had some plaintiffs argue that, well, what if it was 0.4% and it went to 0.6%, and the CIT has ruled, like, that's not the case in front of us. Clearly, if it's going from 0 to 3.5%, that's a meaningful difference, because the A2A methodology isn't revealing something, and the ADT is. But it's important here to note that it really is dumping going on. This is at page – I'm sorry – 3724 of the record and 3660 of the record, where it's in black and white the portion of the overall year's sales that were in February 2010 were a significant portion of sales. And at 3724, it indicates the percentage of those targeted sales that turned out to be sold at less than fair value. And the overwhelming majority of those sales were sales that were dumped. So commerce isn't simply applying a mechanical statistical test. It's identifying a pattern of price differences. But by not providing any guidance on what constitutes a meaningful difference. I mean, on a case-by-case basis, you're just saying we sort of know it when we see it. When we get the numbers, we'll tell you if you fail. Well, not true, Your Honor. Actually, as commerce's practice has developed, for example, today commerce has indicated that a meaningful difference would be crossing the minimum threshold, which has happened in a number of cases, and that's what happened here. Commerce has also indicated, as it's moved to a differential pricing model, that a difference of greater than 25% would – if you're not crossing the minimum threshold – would constitute a quote-unquote meaningful difference. But we don't have that here because it's about the minimum threshold. Also, it's important to note that it's certainly not a truism that you always get a different result between the A-to-A methodology and the A-to-T methodology. In particular, we cited two instances where commerce found a pattern of price differences that satisfied the first prong of the statute and passed the NAILS test. But then when commerce went to look at whether there was a meaningful difference between the A-to-A methodology and the A-to-T methodology, it determined there was not one because essentially you got very similar results with the two because, unlike this case, you didn't have targeted dumping going on where the sales that passed the NAILS test resulted in a margin from unmasking by not averaging it with other sales. We cited those cases at page 40 of our brief. Those were the polyethylene film from China cases, which is 78 FEDRAG 35247 at issue 8, and also the carbon and alloy steel wire from Mexico case, which is 78 FEDRAG 28190 at comments 3 and 4. I'm sorry, for that first one, it's issue 8, note 108. Those were both cases where you had companies that passed the NAILS test and there was a pattern of price differences, but ultimately because there was no meaningful difference between the A-to-A and the A-to-T methodologies, commerce determined that it was not appropriate to go on and apply the A-to-T methodology as the official methodology for the review and therefore seek to unmask targeted dumping. But the reason that the statute says, the FAA says may, is because until you actually go and apply it, and granted commerce methodology cuts to the chase a little bit by using it as a meaningful difference test as well, you really haven't identified targeted dumping, you're just looking at the pattern of U.S. prices. A couple of very quick points. We have made a Chevron 1 argument, and the issue there is this court should follow what it did in Nippon Steel, where a party made a very similar argument about intentionality. And the court said, look, the statute clearly does not say that. Commerce could certainly choose to look at those issues, but it's certainly not required, and so under Chevron step 1, the statute doesn't require it. The other thing is on the issue about whether this is fair, or whether this leads to an absurd result under Chevron step 2. That's clearly not the case for several reasons. First, because the FAA, the statute authorizes this methodology, and the FAA assumes that this will be the normal methodology in reviews, because at the time this was the normal methodology, the A-to-T methodology in reviews. Second, it's fair because it turns out at the end of the day, even if the pattern has something to do with cost differentials of gross on raw material costs, the vast majority of the sales in this targeted time period were dumped. They were sold at less than fair value in the United States. And finally, it's fair because this is consistent with the overall concept of dumping. The domestic industry is no less entitled to a remedy for dumping, because there are good commercial reasons for a party doing it. Dumping in general is not about intentionality, it's about pricing discrimination that affects the domestic industry, and that's no less true with targeted dumping than regular generic dumping. We ask that the court sustain the judgment of the court of law. Okay, thank you. Ms. Hillman, are you going to tell us how to find a meaningful difference? Yes, Your Honor, I'd be delighted to. What you have before you, I think, is the classic case that fits what the statute is designed to do. What happened in this case is that Borison concentrated a significant portion of its sales in the single month of February, and the overwhelming majority of those sales were made at dumped prices. So now what Borison wants you to do is to force the Commerce Department to average those heavily concentrated dumped sales over the sales in all of the rest of the period of the investigation in order to wash out or mask the meaningful difference that you are exactly asking about, Judge Newman. That's what they want to do. They want to allow those other sales later on to cover up the fact that they engaged in this significant amount of dumping concentrated in the month of February. And what the statute is clearly saying, and the statute was set up to address exactly this situation, is all that commerce is required to do is to find is there a pattern of significant differences between the prices, the export prices in the month of February versus the rest of the month. That's exactly what they did. Are those price differences significant? Yes. Then what commerce does is analyze what would be the dumping margin if you do it on this weighted transaction basis so that you can account for this concentration of highly dumped imports versus what would be the margin if you average it out over all of the others and balance those concentrated dumped sales with something later on in the period that might be a higher price. That's exactly what commerce did. But the argument is that there's nothing going on other than math. In other words, you're saying as long as there's some price differential at some period of time, then we can immediately bounce out of the average-to-average or transaction-to-transaction methodology. And their argument, at least, is, okay, let's start with the math and see if there's price differential, but then let's see if that price differential actually does reflect dumping rather than jumping to the end conclusion that it's necessarily dumping. What I think it requires is, again, before you can even go down this road, you have to identify, is there a pattern, yes or no? And that's a straightforward question. It doesn't require intent or anything, as they would suggest. Straightforward, is there a pattern, yes or no? Then is that pattern significant? So again, commerce then engages in an analysis about whether those differences in price are significant. On both of those, again, here unequivocally the answer was yes, and Borson is really not contesting that basic part of the test. Then you get to the does it make any difference, whether you apply an averaging methodology or whether you apply a weighted-to-transaction methodology. So there is no step to say what accounts for the price difference. That's my question. In other words, you're basically answering my other question, yes, but it's all just math. Well, there is no requirement in the statute to show why are there price differences. There's no intent. Right, that's the heart of the question. The statute does not require any showing of an intention to target or of an intention. Again, what happened here was the dumping was already occurring, so whether or not prices changed as a result of changes in cost doesn't change the fact that they were dumping. So they started out with export prices below home market prices. If then costs come along and increase, you increase both of the prices. That does not change the fact that they are dumping, and the fact that costs may or may not have increased does not excuse Orison's obligation not to dump. So whether or not the price has changed for any reason doesn't change the fact that they are not permitted to dump. They are under a dumping order, and they're not allowed to continue to dump, and they're not allowed under the statute to allow the averaging to hide the dumping that is occurring, that did occur in the month of February. Okay. Thank you, Ms. Sheldon. Thank you. Mr. Cameron. Your Honor, thank you very much. I appreciate the time. The government refers to meaningful difference. There's a lot of discussion here about, well, if it's over de minimis, then it's meaningful difference, and therefore we can go to A to T. I would refer you to the statute and to the SAA. The meaningful difference that he then defines is over de minimis. You're not going to find that in the statute or the SAA. The statute is not talking about any dividing line there. It says examine and explain. And the one thing that's clear from the statute and the SAA is that you can use A to T, average to transaction, only if you determine that there is a pattern of pricing and that it can't be taken account of in the normal course of business using average to average. So if you can't take that into account, if you can't explain it, if examining under A to A, that's fine. But just saying, well, you know, I did it by average to transaction and it resulted in over de minimis, and therefore because I had a pattern, automatically that puts me in. I've given myself the excuse, by the way, to get to average to transaction, which is where I started. This is very circular. These guys have said in their briefs constantly that we've put the cart before the horse because we've said you actually have to find targeted dumping before you use average to transaction. And the answer is it's absolutely right. Well, the statute does. I mean, I know I gave the other side a hard time about math, but I'm giving you a hard time too. The statute does contemplate that there needs to be some mechanism to make this determination, and just average to average doesn't account for a concentrated area of expense. Well, fair enough. But this is where I think it is useful to look at what Judge Rustani was discussing in Borden. I understand it's not precedent, but it's interesting because she's discussing the tension that existed in developing this statute, the tension between the amplification of margins through using average to transaction with zeroing or masking dumping. And what she said is, you know, in the end, they came out in favor of reducing the amplification of dumping. That's the reason this is the exception and not the rule. So, yes, there has to be a test, but that's what the examination is. I would suggest to you that what we're suggesting is not revolutionary. If you look at Borden, if you look at that Kelso Oi, and if you look at the Beijing case that my colleague referred to, they all refer to the fact that, well, there can be other explanations for significant price differences. And what are they? And there may be significant price differences that are not targeted dumping. And if those significant price differences aren't targeted dumping, then they're not supposed to be using this exception. So that is our position, Your Honor, that this is an exception to the rule, and that's the reason that it says, examine and explain. And when you have those cost differences and you can explain it, then that has to be taken into account, and they can't just say, I'm not going to look at it. Thank you very much. We appreciate your time. Thank you, Mr. Cameron. Thank you all. The case is taken under submission.